UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ANTONIO BUCKMAN,

    Plaintiff,

v.                                                Case No. 3:19-cv-953-MMH-PDB

GEORGE EMANOILIDIS,

    Defendant.
_____

# **ORDER**

## **I. Status**

Plaintiff Antonio Buckman, an inmate of the Florida penal system, initiated this action by filing a Complaint (Doc. 1) on August 16, 2019. He named Sergeant Brett Warner, Officer Lucas Karr, Officer Hall, Lieutenant Stephen Thompson, and Dr. G. Emanoilidis[1] as Defendants. Pursuant to a stipulation, the Court dismissed with prejudice the claims against Defendants Hall, Karr, Thompson, and Warner. See Order (Doc. 52). Thus, the only claim

---

[1] In the Complaint, Buckman misspelled Defendant's surname as "Emanoilieds." Doc. 1 at 1. The Court uses the correct spelling here.

remaining before the Court is Buckman's Eighth Amendment deliberate indifference claim against Defendant Emanoilidis.

Before the Court is Emanoilidis' Motion for Summary Judgment. See Defendant Dr. George Emanoilidis' Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 45; Motion). The Court advised Buckman that the granting of a motion for summary judgment would be an adjudication of his claims that could foreclose subsequent litigation of the matter and allowed him to respond. See Order (Doc. 6). On June 1, 2021, Buckman filed a notice stating the following – "Please be advised that I do not wish to respond to the Defendant's Motion and I seek that this case is officially closed." Doc. 56. Thus, the Court deems unopposed Emanoilidis' Motion. However, "the district court cannot base the entry of summary judgment on the mere fact that the motion [is] unopposed but, rather, must consider the merits of the motion." United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101 (11th Cir. 2004) (citation omitted). As such, the Court "must still review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." Mann v. Taser Int'l Inc., 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted). In

doing so and for the reasons below, Defendant Emanoilidis' Motion is due to be granted.

**II. Summary of Buckman's Allegations and Emanoilidis' Motion[2]**

Buckman alleges that on December 8, 2017, he declared a psychological emergency to Defendants Warner, Karr, and Hall and threatened to cut himself. Doc. 1 at 8. According to Buckman, when the individuals failed to provide him with assistance, he cut his left wrist, began tapping on his cell window, and yelled that he had a psychological emergency, so that he could receive mental health assistance. Id. at 13. He asserts that about 10 minutes later and in retaliation for his declared psychological emergency, Defendants Thompson and Warner approached his cell and ordered Buckman to relinquish his property for placement on 72-hour property restriction. Id.

Buckman contends that Emanoilidis, the facility's mental health director, then approached Buckman's cell "to initiate a ([Crisis Intervention Technique])," during which Buckman allegedly showed Emanoilidis that he had cut his left wrist and advised Emanoilidis that he was declaring a psychological emergency. Id. According to Buckman, Emanoilidis "stated that [Buckman]'s psych-emergency would be taken care of after Plaintiff

---

[2] Because this cause is before the Court on Emanoilidis' Motion, the Court focuses its summary on the allegations and claims against him.

3

relinquished his property to the prison officials to be placed on 72[-]hour property restriction." Id. at 14. Buckman alleges that he advised Emanoilidis "that there was no legitimate reason as to why [he] was being placed on 72[-]hour property restriction and that [he] had a psych-emergency." Id.

Buckman contends that correctional officials began filming him in anticipation of a potential use of force. He asserts that he agreed to comply with strip-search and handcuffing procedures, but during the strip search, "Warner lied by stating that [Buckman] was not conducting a proper strip search," and thus, Thompson ordered officials to use chemical agents on Buckman. Id. Buckman maintains that while he was in the decontamination shower, "he informed [] Emanoilidis that he still had a psychological emergency," and he "further informed [] Emanoilidis of his psychological problems of being under extreme stress, that he was hearing voices, and was having suicidal and homicidal thoughts and needed to be placed in the SHOS[3] cell or he was gonna cut again." Id. at 15. According to Buckman, Emanoilidis "disregarded" his "threat to self-harm himself again and refused to place [Buckman] in the SHOS cell." Id. Instead, Buckman asserts that Emanoilidis "informed [] Thompson that [Buckman]'s issue[] was a security problem which caused [him] to start self inflicting cuts to his left wrist in front of []

---

[3] Self-Harm Observation Status.

Emanoilidis." Id. Buckman alleges that he was "denied medical treatment or to be seen by medical for his cuts and was escorted back to his cell." Id.

Based on these facts, Buckman alleges that Emanoilidis was deliberately indifferent to his serious mental health needs. Id. at 10. He states: "The acts and omissions of [] Emanoilidis['] deliberate disregard[] of Plaintiff's mental health needs from safety of self-harm was intentional, harmful and reckless that was so grossly incompetent and inadequate as to shock the conscience or to be intolerable to fundamental fairness that violates the Eighth Amendment." Id. He contends that Emanoilidis "ignored [Buckman's] threat which caused [him] to cut himself several times." Id. As relief, Buckman seeks a declaratory judgment, compensatory and punitive damages, and any other relief deemed just and proper. Id. at 18.

In his Motion, Emanoilidis asserts, inter alia, that he is entitled to summary judgment because Buckman cannot establish a constitutional violation.[4] Motion at 12-18. He argues that he fulfilled his duties to conduct a

---

[4] Emanoilidis also argues he is entitled to qualified immunity; 42 U.S.C. § 1997e(e) bars Buckman's claims for compensatory and punitive damages; Buckman's claims for declaratory relief fail; and Buckman's settlement agreement with the Co-Defendants bars his claims against Emanoilidis. See generally Motion. Because on the undisputed facts Buckman fails to establish a genuine issue of fact as to his claim that Emanoilidis violated his constitutional rights, the Court only addresses that argument.

5

thorough mental health evaluation of Buckman and based on his training and professional judgment, Buckman did not pose a significant risk of self-harm to warrant placement on SHOS. Id. at 17. In support of his Motion, Emanoilidis provides his own Declaration, in which he states, in pertinent part:

> On December 8, 2017, Florida State Prison's prison security staff requested that a member of Florida State Prison's mental health department perform Crisis Intervention Techniques ("CIT") on Plaintiff. CIT entails that before prison security staff use force against a noncompliant inmate, prison security staff notifies a mental health professional to talk to the inmate and de-escalate the situation. Prison security staff was placing Plaintiff on property restriction for a disciplinary violation and he was not complying. Property restriction is a disciplinary infraction in which an inmate's state and personal property are removed from his cell for 72 hours. At approximately 3:11 p.m., I went to Plaintiff's cell, B1212. When I arrived, Lieutenant Stephen Thompson was standing outside Plaintiff's cell and Sergeant Simon Wilson was recording the incident on a hand-held camera. In an effort to deescalate the situation, I talked to Plaintiff. He yelled that he was claiming a psychological emergency and that prison security staff were retaliating against him for declaring a psychological emergency. He threatened to cut himself if his psychological emergency was not addressed. I told him that I was the mental health director and that I was there to perform Crisis Intervention Techniques and deescalate the situation. I advised him to first comply with Lieutenant Thompson's order and then he would be removed from his cell and I would address his psychological emergency. I asked Plaintiff if he would agree to comply with Lieutenant Thompson's order. Plaintiff agreed to comply. Lieutenant Thompson told Plaintiff

that they were going to take him to the decontamination shower and then he would speak with me. Plaintiff changed his mind. He refused to provide his state issued property to Lieutenant Thompson and Lieutenant Thompson called other security staff to remove Plaintiff from his cell. As the situation escalated, I left the area immediately outside of Plaintiff's cell. At no point, during this interaction did Plaintiff tell me that he had previously cut himself, show me any of his self-inflicted cuts, or tell me that he possessed a weapon to cut himself.

I next saw Plaintiff at about 3:47 p.m. At this time, Lieutenant Thompson took me to the decontamination shower to evaluate Plaintiff. I came to address his psychological emergency and conduct a Post Use of Force evaluation. At this point, Plaintiff was only in his boxers. I did not see any weapons or objects that Plaintiff could use to harm himself in the decontamination shower. Plaintiff repeatedly stated that he was homicidal and suicidal. He complained about the conditions of his cell. He stated that another inmate had hung himself in Plaintiff's cell, that his window would not close, and his cell had rats. He threatened to cut himself if he was not placed in a self-harm observation status ("SHOS") cell. Based upon Plaintiff's presentation, demeanor, and my assessment, I did not perceive Plaintiff to pose a significant risk of self-harm to warrant placement in a SHOS cell. Accordingly, I told Lieutenant Thompson that Plaintiff was a security issue and needed to be put back in his cell. Upon hearing this, Plaintiff scratched his left wrist three times with a tiny object. I did not see the tiny object before he began to scratch himself and he did not tell me that he possessed any object that he could use to inflict self-harm.

My decision not to place Plaintiff in a SHOS cell was solely based on my professional training and judgment. When an inmate is placed on SHOS, he is

7

removed from [his] normal cell and placed in a bare cell with only a suicide mattress and blanket. The inmate is observed every fifteen minutes by a healthcare professional. The inmate is also evaluated by a mental health professional and released when it is determined that the inmate is no longer at risk for self-harm. At times, inmates will feign illness to gain SHOS admission. Placing an inmate in an SHOS cell is a case by case determination. When making this determination, I assess the psychological needs of the inmate and provide him with the appropriate treatment according to my psychological training and education, not the inmate's preferred course of treatment. I evaluate an inmate's risk for serious self-harm and whether SHOS would be required to further stabilize the inmate's mental health symptoms. If it is necessary to place an inmate in a SHOS cell, I place an inmate in the SHOS cell.

I did not find it necessary to place Plaintiff in a SHOS cell on December 8, 2017. While Plaintiff stated that he was homicidal and suicidal, he did not elaborate on why he felt this way. While Plaintiff appeared angry and agitated, his speech was coherent, he made socially appropriate eye contact, and there was no evidence of delusions. I noted that he did not have any significant mental impairment. In my professional opinion, he was upset about being placed on property restriction and was making threats to be placed on SHOS to control his housing assignment. I did not find that he posed a significant risk of self-harm to warrant placement in a SHOS cell. I recommended that Plaintiff be seen by his case manager for a follow-up. I did not believe that there was evidence of acute mental illness.

I had no further involvement with Plaintiff regarding this incident.

> As the Psychological Services Director, I am not involved in prison security, such as searching inmates for weapons. I do not oversee or supervise the prison security staff.

Motion Ex. 6 at 4-8. Attached to the Declaration are Buckman's medical records, including his mental health evaluation. See id. at 10-16. Emanoilidis also provides video surveillance footage of his encounters with Buckman; as well as, a transcript of Buckman's deposition testimony (Motion Ex. 2); Charging Disciplinary Report Log # 205-172793 (Motion Ex. 3); Report of Force Used (Motion Ex. 4); Incident Report (Motion Ex. 5); and a copy of the Settlement and Release of All Claims between Buckman and the remaining Co-Defendants (Motion Ex. 7).

### III. Summary Judgment Standard

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93

F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), in order to discharge this initial responsibility." Gonzalez v. Lee Cnty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

If the non-moving party does not oppose a summary judgment motion, then the court may grant the unopposed motion after due consideration of the merits and the evidence presented. See Howard v. Gee, 538 F. App'x. 884, 890 (11th Cir. 2013) (affirming denial of unopposed motion for summary judgment where court gave "due consideration to the merits" of defendants' motion "and the evidence presented"); see also Fed. R. Civ. P. 56(e)(3) (providing for entry of summary judgment if a motion and supporting materials "show that the movant is entitled to it" and the opposing party "fails to properly address another party's assertion of fact").

## IV. Analysis

Under the Eighth Amendment, prisoners have a right to adequate medical care and treatment, which includes mental health care and "a right to be protected from self-inflicted injuries." Watson v. Edelen, 76 F. Supp. 3d 1332, 1368 (N.D. Fla. 2015) (citing Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1115 (11th Cir. 2005)). "To establish liability for a prisoner's self-harm, under section 1983, the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's

11

physically harming himself." Id. (citation omitted); see Osterback v. McDonough, 549 F. Supp. 2d 1337, 1349 (M.D. Fla. 2008) ("To establish an Eighth Amendment violation for failure to protect against self-inflicted injuries, a prisoner must show that the prison official(s) displayed deliberate indifference to the prisoner's threat of taking of his own life."). Deliberate indifference requires "three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (citations omitted); see Patel v. Lanier Cnty. Ga., No. 19-11253, 2020 WL 4591270, at *9 n.10 (11th Cir. Aug. 11, 2020) (recognizing "a tension within [Eleventh Circuit] precedent regarding the minimum standard for culpability under the deliberate-indifference standard," as some cases have used "more than gross negligence" while others have used "more than mere negligence"; finding, however, that it may be "a distinction without a difference" because "no matter how serious the negligence, conduct that can't fairly be characterized as reckless won't meet the Supreme Court's standard" (citations omitted)).

In cases involving suicide or attempted suicide,

> "[D]eliberate indifference requires that the defendant deliberately disregard 'a strong likelihood rather than a mere possibility that the self-infliction of harm will occur.'" [Cook, 402 F.3d at 1115.] "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with

12

> the care of prisoners." <u>Tittle v. Jefferson Cnty. Comm'n</u>, 10 F.3d 1535, 1540 (11th Cir. 1994) (en banc). To be deliberately indifferent to a strong likelihood that the prisoner will harm himself, the official must be subjectively aware that the combination of the prisoner's self-harm tendencies and the feasibility of self-harm in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will self-inflict harm. See <u>Gish v. Thomas</u>, 516 F.3d 952, 954-55 (11th Cir. 2008).

<u>Watson</u>, 76 F. Supp. 3d at 1368-69.

The Court has reviewed the record. The uncontested evidence shows Emanoilidis approached Buckman's cell and advised Buckman that he would address Buckman's psychological emergency after Buckman complied with correctional officials' request to place him on property restriction. After the other Defendants subjected Buckman to chemical agents, ordered a strip search, and placed Buckman in a decontamination shower, Emanoilidis again spoke with Buckman about his self-declared psychological emergency. Buckman told Emanoilidis that he was experiencing extreme stress, hearing voices, and having suicidal and homicidal thoughts that require his placement in a SHOS cell. Emanoilidis determined that Buckman's issue was a security/management problem. Buckman disagreed with this assessment, and immediately began cutting his left wrist in front of Emanoilidis. Then Buckman was placed back into his cell on property restriction.

Buckman alleges that Emanoilidis had only one option – place Buckman

13

in a SHOS cell – otherwise, Emanoilidis acted deliberately indifferent. But Emanoilidis' decision to place Buckman back in a cell on property restriction rather than in a SHOS cell is a difference of opinion between Buckman and Emanoilidis, which fails to show deliberate indifference. See Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) ("[I]t is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." (quoting Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989))). Nor did Emanoilidis have the time or opportunity to protect Buckman from himself. Buckman testified in his deposition that before heading to the decontamination shower in only his boxer shorts, he concealed a piece of metal in his mouth and told none of the officers about the makeshift weapon. Motion Ex. 2 at 61. Buckman showered and remained in the decontamination cell for his second consultation with Emanoilidis. Right after Emanoilidis refused to provide Buckman with his requested housing status, Buckman began to harm himself in front of Emanoilidis. Buckman fails to present any evidence that Emanoilidis had any way to know that Buckman possessed the makeshift weapon much less that he had actual subjective knowledge of the weapon. Nor has Buckman presented evidence from which a jury could reasonably conclude that Emanoilidis was subjectively aware of a strong likelihood, given the surrounding circumstances, that Buckman would inflict self-harm. As such,

14

Buckman has failed to present a genuine issue for trial on the question of whether Emanoilidis violated his Eighth Amendment constitutional right.

In sum, after due consideration of the merits and the undisputed evidence presented, the Court finds there is no genuine dispute as to any material fact and that Emanoilidis is entitled to judgment as a matter of law.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1. Defendant Emanoilidis' Motion for Final Summary Judgment (Doc. 45) is **GRANTED**.

2. The **Clerk** shall enter judgment for Defendant Emanoilidis, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 28th day of June, 2021.

*[Signature]*
MARCIA MORALES HOWARD
United States District Judge

Jax-7
c:
Antonio Buckman, #Q09285
Counsel of Record